AFFIDAVIT

I, Benjamin Wallace, Special Agent, Federal Bureau of Investigation ("FBI"), being sworn, state as follows:

1. I am a Special Agent with the FBI's Boston Field Office. I have worked for the FBI since 2009. Before joining the FBI, I was a Special Agent with the United States Secret Service ("USSS") for approximately four years. Before that, I worked as a police officer with the City of Atlanta, Georgia Police Department for approximately five years.

2. I am presently assigned to FBI Boston's Organized Crime Task Force (the "FBI Task Force"). The mission of the FBI Task Force is to identify, investigate, disrupt and dismantle sophisticated criminal organizations operating in Massachusetts, with a particular focus on those groups connected to national or transnational criminal networks that pose the greatest threat to the national and economic security of the United States. The FBI Task Force utilizes a broad array of techniques to conduct these investigations, including utilizing information received from confidential human sources; examining and exploiting telephone, social media, and financial records; and embedding undercover agents in dangerous groups that are difficult to infiltrate.

3. On October 7, 2022, I submitted an affidavit in support of an application for a criminal complaint charging that, from in or about May 2021 to the present, (1) Jin Hua ZHANG, (2) Licheng HUANG, (3) Feng CHEN, (4) Roger LUO, (5) Thong NGUYEN, (6) Augustin VILLA, and (7) Mariano SANTANA conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), and that during the same time period, ZHANG conspired to distribute and to possess with intent to distribute 5 kilograms or more of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846. That day, this Court

issued the complaint. See No. 22-6321-MPK, attached hereto as Exhibit 1 and incorporated by reference herein (hereinafter, the "October 7, 2022 Complaint").

4. I submit this affidavit in support of an application for a criminal complaint charging that, from in or about May 2021 to the present, (8) Rongjian LI and (9) Qinliang CHEN conspired with ZHANG and others to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). In addition, during the same time period, (10) Yanbing CHEN and (11) Xiong LIN conspired with ZHANG and others to distribute and to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846. Specifically, (10) Yanbing CHEN conspired to distribute and to possess with intent to distribute five kilograms or more of cocaine and (11) LIN conspired to distribute and to possess with intent to distribute 500 grams or more of cocaine.

5. As is set out in detail in Exhibit 1, the FBI Task Force used cooperating witnesses ("CWs") and undercover agents ("UCs") to infiltrate a criminal organization that was led by ZHANG and laundered large sums of money for various criminal groups. Agents on the FBI Task Force first detected the network in greater Boston but also identified leaders and members of the group throughout the United States and overseas. Over the past year, agents determined that ZHANG and his associates (the "ZHANG Organization") laundered at least $25 million worth of drug proceeds and profits from other illegal businesses. To date, agents have traced funds from the ZHANG Organization to Hong Kong and elsewhere in China, India, Cambodia, and Brazil, among other locations. The investigation also revealed that the ZHANG Organization distributed kilogram-sized quantities of cocaine, a Schedule II controlled substance, and MDMA, or ecstasy, a Schedule I controlled substance, to FBI CWs and UCs.

6. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts necessary to establish probable cause to believe that LI, Qinliang CHEN, Yanbing CHEN, and LIN committed the violations set forth in the accompanying criminal complaint.

7. <u>LI's Participation in the ZHANG Money Laundering Conspiracy</u>. On April 3, 2022, UC-1 and UC-2 had dinner in a restaurant in Brooklyn with ZHANG, a second New York-based associate of ZHANG's, and an individual who agents identified as Rongjian LI. ZHANG introduced LI to UC-1 as his friend who worked at Bank of America. During this investigation, agents determined that "Rong Li" was a Bank of America employee who opened several accounts that ZHANG Organization members used to launder illicit funds. Agents obtained Bank of America records showing that LI frequently ran queries checking on the status of these accounts.

8. During the dinner meeting on April 3, 2022, with LI present throughout, UC-2 discussed UC-2's concerns about ZHANG making Zelle transfers to UC-2's accounts because law enforcement was aware that Zelle was used to commit fraud.[1] LI agreed and told UC-2 about a particular scam, where a fraudster would contact a telephone company and, using a victim's name, report that he had lost his phone and request that the phone company issue him a new SIM card. The fraudster would then use information from this newly-issued SIM card to access the victim's Zelle account. Based on my training and experience in this case, I know that a scammer accessing a victim's Zelle account could transfer funds out of the victim's account and into an account controlled by the fraudster.

---

[1] Zelle is a digital payment network that enables individuals to electronically transfer money from the bank account of the sender to the account of another registered user, typically involving the registration of a telephone number or email address.

9.      With LI present, ZHANG discussed with the UCs the location and volume of future cash pick-ups and sources of illicit funds to be laundered. ZHANG explained that if UC-1 wanted to earn a higher point (a higher fee for laundering the money), then UC-1 had to accept direct transfers from the clients (meaning, the fraud victims) instead of receiving funds from one of ZHANG's intermediary shell companies. UC-1 said the current operation – receiving funds through ZHANG's shell companies –was the safest way to do business because UC-1 had set up an account specifically for UC-2 to use to convert ZHANG's deposits to cryptocurrency. ZHANG agreed to keep their business arrangement the same. UC-1 stated that UC-1 would continue to charge three points for direct transfers from ZHANG's account if the money was from "T5" fraud (as was described in the October 7, 2022 Complaint, T5 refers to fraud proceeds). However, if ZHANG transferred "white powder" (cocaine) money and told UC-1 it was from T5, then ZHANG put everyone at risk.

10.     With LI still present, ZHANG discussed investment fraud operations in Cambodia and his partnership with the UCs to lauder the illicit proceeds from ZHANG's Cambodia-based associates. ZHANG told the group at the dinner that Cambodia was just a place where people were working (perpetrating the defrauding of victims through use of the internet and phone) and that all the clients (i.e., victims) were here, meaning in the United States. ZHANG told those at the table, including LI, "So some team (the fraud group) is still in China to operate this, some more team operate this in Cambodia, because Cambodia is, you're not gonna get caught, you know?" Based on my training and experience in this case, ZHANG's statement meant that the organizers of the group that was engaged in defrauding U.S.-based victims were based in China.  However, the people who were engaged in running the day-to-day fraud operations were based in Cambodia. UC-2 said, "Yeah, so all the clients are here, but all the business is done in Cambodia so the

transfers are out of Cambodia. But it's the same type, right? Just T5?" Again with LI present, ZHANG replied, "Yeah."

11. ZHANG told the group that he had many accounts but that he does not give his clients (i.e., his money laundering customers) all of his accounts at once. ZHANG used one or two accounts at any given time until they "die," meaning when bank security or law enforcement freezes the account. ZHANG indicated that this normally takes one month. ZHANG said that each account would do at least one million dollars in one month before it died. ZHANG said he has clients from China, Cambodia, New York, and elsewhere, and whatever risk UC-1 was willing to share, ZHANG was willing to share in the profit.

12. On April 18, 2022, UC-2 had a consensually recorded Telegram call with ZHANG. During the call, UC-2 told ZHANG that a Bank of America account into which ZHANG was depositing money was fine. ZHANG informed UC-2 that his associate, who worked at Bank of America (LI), told him that UC-2's account had a lot of alerts on it. As a result, UC-2 and ZHANG agreed to use a different bank for future money laundering transactions. After these recorded conversations, agents learned that LI had resigned from Bank of America. Within the past month, when ZHANG confided to UC-2 that he had had a couple of accounts frozen and asked UC-2 for help, UC-2 responded by saying, "What about your guy at Bank of America?" ZHANG responded, "No he's not there anymore."

13. In summary, LI was aware of ZHANG's money laundering conspiracy through his participation in lengthy conversations during which ZHANG and others discussed multiple money laundering schemes. Moreover, during the charged time period, LI knowingly took steps to further the objectives of the conspiracy, such as opening several accounts that ZHANG used to launder funds through UC-2, and regularly checking on the status of those accounts. ZHANG confirmed

LI's role in the conspiracy by telling UC-2 that "his guy" had left Bank of America shortly after LI had resigned from the bank. All of this evidence establishes LI as a member of ZHANG's money laundering conspiracy.

14. <u>Agents Seize $161,905 From Qinliang CHEN</u>. The October 7, 2022 Complaint identified several instances in this investigation where couriers delivered large amounts of cash to CWs and the UCs and ZHANG directed UC-2 to provide an equivalent amount of Tether, minus a fee. During the investigation, agents identified California-based drug courier Qinliang CHEN, who delivered more than $120,000 in cash to an FBI CW. ZHANG asked UC-2 to provide Tether in exchange for the cash. Qinliang CHEN made the delivery at a grocery store parking lot near Orlando, Florida. At a second meeting in Florida, law enforcement seized $161,905 from Qinliang CHEN as he tried to make a second delivery of ZHANG's to-be-laundered cash.

15. In mid-August 2022, ZHANG used Telegram to inform UC-2 that there was approximately $120,000 in cash that needed to be picked up in Orlando, Florida. On August 19, 2022, agents traveled with CW-1 to a Publix parking lot at 851 South State Road 434 in Altamonte Springs (near Orlando), Florida. There, CW-1 picked up a bag containing $125,675 in cash from a Chinese courier who arrived in a rented minivan. In exchange for the cash, UC-2 sent ZHANG an equivalent amount of Tether, minus a fee. The cell phone number that the courier used to communicate with CW-1, (626) 554-7241, did not have identifiable subscriber information. However, the minivan that the courier used to make the delivery was rented to Qinliang CHEN. The phone number on file with the rental car company was associated with Qinliang CHEN and he provided the rental car company his home address in Rosemead (Los Angeles County), California. Agents showed CW-1 Qinliang CHEN'S driver's license photo and CW-1 identified him as the courier. Agents also identified Qinliang CHEN from the video recording of the meeting

with CW-1. After this meeting, agents reviewed a report that on April 19, 2020, Qinliang CHEN attempted to pass through TSA Security at Orlando International Airport carrying $99,780 in cash.

16. On September 12, 2022, ZHANG used Telegram to inform UC-2 that there was approximately $150,000 in cash that needed to be picked up in Orlando. UC-2 told ZHANG that CW-2 would be in Florida and could collect the cash. Agents believed that Qinliang CHEN would again make the delivery and moved to seize the cash.

17. On September 13, 2022, CW-2 advised that she had a missed call from an as-yet unidentified dispatcher working for ZHANG. The dispatcher contacted CW-2 to ask in Mandarin, "Are you there?" Based on the context, the dispatcher's message was an inquiry regarding CW-2's availability to receive the cash. CW-2 responded that CW-2 was available. CW-2 then called the phone Qinliang CHEN used during the August 19, 2022 deal, telephone number (626) 554-7241, and they agreed that CW-2 would pick up the cash on September 15, 2022.

18. On September 14, 2022, CW-2 sent the dispatcher a text message containing a photo of a dollar bill, which would serve as the pick-up token (as described in the October 7, 2022 Complaint), and the location for the meet. The delivery would occur at the previously used Publix parking lot at 851 South State Road 434 in Altamonte Springs, at 11:00 a.m. The dispatcher contacted CW-2 and asked to reschedule the money pick up for September 16, 2022, and CW-2 agreed to pick up the money that day at the same location.

19. On September 16, 2022, at 10:30 a.m., agents were with CW-2 when CW-2 received a telephone call from telephone number (626) 554-7241, a telephone number used by Qinliang CHEN. As agents recorded the call, CW-2 confirmed the meeting time, and Qinliang CHEN told CW-2 that he would be driving a minivan. Qinliang CHEN sent CW-2 an image of the rear of his Chrysler Pacifica minivan with Florida registration EVTF17 (another rented van).

7

Qinliang CHEN moved the meeting location slightly, to 971 North State Road 434, and confirmed the 11:00 a.m. meeting time.

20. At 10:46 a.m., an FBI surveillance team in Florida observed Qinliang CHEN's minivan arrive in the specified parking lot. Agents requested that Altamonte Springs Police Department officers approach the minivan. Qinliang CHEN was in the driver's seat, and a woman, later identified as his sister, was in the second row of the van behind the driver's seat. Officers asked Qinliang CHEN why he was sitting in a parking lot, and he replied that he was waiting for a restaurant to open. The officer asked if he could search the vehicle, and after a conversation with his sister, Qinliang CHEN said yes. During a search of the van, officers recovered a black duffel bag in a storage compartment in the floor behind the front seats. When asked, both Qinliang CHEN and his sister denied that the bag belonged to them. Qinliang CHEN said he had rented the car and had not checked the storage compartment. The officers opened the bag and emptied the contents onto the ground: two vacuum sealed bags of cash and one bag of banded cash. The officers said that since the bag was not being claimed by Qinliang CHEN or his sister, they were going to seize it as evidence. Officers provided Qinliang CHEN and his sister a receipt, and they were allowed to leave. Agents determined that the bag contained $161,905 in cash.

21. Later that day, CW-2 exchanged recorded text messages with ZHANG's dispatcher and Telegram calls and messages with ZHANG. When they demanded to know what happened, CW-2 told both ZHANG and the dispatcher that CW-2 arrived at the parking lot and observed the police stop the courier's minivan.

22. <u>Yanbing CHEN and LIN's Participation in ZHANG's Drug Trafficking Conspiracy</u>. As was set forth in the October 7, 2022 Complaint, on or about August 11, 2022, agents recorded Telegram communications between ZHANG and UC-2. In the messages, ZHANG

8

advised UC-2 that he had sent three kilograms of cocaine to the Boston area for sale. UC-2 agreed to pay ZHANG for a portion of the cocaine upon receipt and pay for the remaining cocaine at a later date. UC-2 and ZHANG agreed that ZHANG would be paid for the cocaine in cryptocurrency transferred to a digital wallet provided by ZHANG.

23. ZHANG then had his courier contact CW-1, who was working with UC-2. In the October 7, 2022 Complaint, I referred to this individual as "Courier 1." Agents have identified "Courier 1" as Yanbing CHEN. By text message, Yanbing CHEN advised CW-1 that the cocaine would be available for pick up the following day in Chinatown, a Boston neighborhood. Yanbing CHEN and CW-1 arranged to meet around 11:00 a.m. around the South Station MBTA terminal, near Chinatown.

24. On August 12, 2022, at approximately 10:50 a.m., agents met with CW-1 near South Station. Agents searched CW-1 to make sure CW-1 was free of money or contraband and equipped CW-1 with a transmitter and an audio-video recording device. Thereafter, CW-1 drove to meet Yanbing CHEN and pick up the three (3) kilograms of cocaine.

25. At South Station, CW-1 called Yanbing CHEN on the number provided by ZHANG. A few minutes later, Yanbing CHEN arrived. Yanbing CHEN and CW-1 got into CW-1's vehicle. According to CW-1, Yanbing CHEN told CW-1 that they needed to drive to where the cocaine was and directed them a short distance away to Beach Street in Chinatown. Once Yanbing CHEN and CW-1 parked on Beach Street, agents observed a tall, young, thin as-yet unidentified Asian male ("Courier 2") enter CW-1's car carrying a backpack. While inside the car, Courier 2 pulled a cardboard box from the backpack and left the box for CW-1. Inside the box were two kilograms of cocaine in vacuum sealed bags and one kilogram of cocaine inside a clear

plastic bag. Yanbing CHEN and Courier 2 then got out of the vehicle and walked away on foot toward Chinatown.

26. Agents followed CW-1 back to a predetermined meeting location. CW-1 was again searched and found to be free of money or contraband. Agents downloaded the video recording of the meeting which captured the meeting between CW-1, Yanbing CHEN, and Courier 2. Agents conducted a field test on the substance in the box, and the test returned a positive result for the presence of cocaine, a Schedule II controlled substance. The approximate weight of the bags with packaging was 3,432 grams. After the meeting, UC-2 used Tether to pay ZHANG for one kilogram of cocaine. (UC-2 sent the funds to a digital wallet provided by ZHANG).

27. In addition to this three-kilogram sale, which was described in detail in the October 7, 2022 Complaint, agents obtained a total of three additional kilograms of cocaine from ZHANG. Beginning with a series of calls and Telegram chats on September 2, 2022, ZHANG and Yanbing CHEN facilitated the delivery of two more kilograms of cocaine in Boston. UC-2 asked ZHANG whether he planned to deliver additional quantities of cocaine, stating "[Y]our guy still coming up with stuff on Monday or Tuesday?" ZHANG responded, "Sunday I guess," and indicated that he would "pass to [CW-1]."

28. On September 4, 2022, ZHANG asked UC-2 to give CW-1 a bank check to deliver to ZHANG's courier when picking up the cocaine. On September 5, 2022, at approximately 8:59 a.m., Yanbing CHEN met CW-1 near the intersection of Lincoln Street and Beach Street in Boston. CW-1 handed Yanbing CHEN the bank check that ZHANG had ask UC-2 to send with CW-1. Yanbing CHEN then got into the backseat of CW-1's car and removed two kilograms of cocaine from his backpack. Agents subsequently conducted a field test on the substance and the test returned a positive result for the presence of cocaine, a Schedule II controlled substance. After the

delivery, UC-2 confirmed that he received the drugs with a Telegram message to ZHANG stating, "Bro, got the stuff."

29. In addition to those five kilograms of cocaine, on May 8-9, 2022, ZHANG and UC-2 used Telegram to discuss ZHANG's providing a cocaine sample that UC-2 could use to evaluate the product and determine whether he would purchase larger quantities. In the exchange, ZHANG sent an image of a kilogram of cocaine to UC-2 and identified it as "coke." During a recorded call on May 11, 2022, ZHANG asked UC-2 about the cocaine sample. ZHANG stated that his friend, the supplier, said the product is "99% pure." ZHANG suggested that UC-2 "make it less pure." Based on my training and experience, I believe that ZHANG meant that UC-2 could add cutting agents to the cocaine to increase the quantity available for sale, a common practice for experienced drug dealers. ZHANG stated, "if you can move it, then we should talk about it." UC-2 indicated that he would be in a position to finalize the deal after discussing it with his (fictious) partner.

30. On May 15, 2022, ZHANG and UC-2 agreed that ZHANG would sell UC-2 one kilogram of cocaine for $27,000. UC-2 would be responsible for accepting delivery in the New York area to bring to Boston, and after ZHANG provided the cocaine, UC-2 would pay ZHANG with Tether. On May 18, 2022, ZHANG used Telegram to send UC-2 a voice message in which he confirmed that the cocaine would be delivered on May 25, 2022. ZHANG indicated that he would arrange for a bulk cash delivery on the same day, but he explained that there would be separate deliveries for the cash and cocaine.

31. On May 25, 2022, ZHANG facilitated the delivery of one kilogram of cocaine in Jersey City, New Jersey. On the day of the delivery, CW-1 and ZHANG communicated via Telegram to select the meeting place. CW-1 and an undercover agent drove to the pre-arranged delivery location and waited for ZHANG's drug courier. However, a few minutes later, ZHANG

used Telegram to direct CW-1 to another location, where his courier would be waiting in a black Toyota. When CW-1 and the undercover agent arrived at the second location, they met Xiong LIN, who was seated in the driver's seat of a black Camry that was registered in his name. LIN handed the undercover agent a shopping bag containing approximately one kilogram of cocaine. LIN was identified by agents who reviewed the video of the meeting. Agents conducted a field test on the substance and the test returned a positive result for cocaine, a Schedule II controlled substance.[2]

32. <u>Conclusion</u>. Based on the information set forth above, I submit that there is probable cause to believe that (8) Rongjian LI and (9) Qinliang CHEN conspired with ZHANG and others to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). In addition, during the same time period, (10) Yanbing CHEN and (11) Xiong LIN conspired with ZHANG and others to distribute and to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846. Specifically, (10) Yanbing CHEN conspired to distribute and to possess with intent to distribute five kilograms or more of cocaine and (11) LIN conspired to distribute and to possess with intent to distribute 500 grams or more of cocaine.

---

[2] As was discussed in the October 7, 2022 Complaint, LIN also delivered a kilogram of MDMA at ZHANG's direction.

I, Benjamin Wallace, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

/s/ Benjamin Wallace
_____
Benjamin Wallace
Special Agent
Federal Bureau of Investigation

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 12th day of October 2022.

_____
The Honorable M. Page Kelley
Chief United States Magistrate Judge